

**IT IS ORDERED as set forth below:**


**Date: November 29, 2021**

_____

**Barbara Ellis-Monro**
**U.S. Bankruptcy Court Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

IN RE:

ROBERT CLARK and CONNIE CLARK,
    Debtors.

CASE NO. 15-42603-BEM

CHAPTER 7

ROBERT CLARK and CONNIE CLARK,
    Plaintiffs,
v.
WELLS FARGO BANK, N.A., et al.,
    Defendant.

ADVERSARY PROC. NO.
18-4012

### <u>ORDER</u>

This adversary proceeding came before the Court for a trial on September 23, 2021

(the "Trial"). John McCullough, counsel for Defendant Wells Fargo Bank, N.A. ("Wells Fargo"),

and David Cox, counsel for Plaintiffs Robert and Connie Clark, were present at Trial. Prior to the

Trial, Plaintiffs and Wells Fargo (collectively, the "Parties") filed a consolidated pretrial order (the

"Pretrial Order") stipulating that the debt owed to Wells Fargo was a student loan (the "Student

Loans" or the "Debt") within the meaning of and as contemplated by 11 U.S.C. § 523(a)(8). [Doc. 37, Ex. C]. The sole issue at Trial was whether the Debt owed to Wells Fargo is excepted from discharge pursuant to 11 U.S.C. § 523(a)(8). [Doc. 1].[1]

Discover Bank, N.A. ("Discover") and Resurgent Capital Services ("Resurgent") were also named as defendants in the complaint filed in this proceeding (the "Complaint") [Doc. 1]. Discover and Resurgent failed to respond to the Complaint and the clerk's office entered default against both Defendants on May 16, 2019. At the close of evidence at Trial, Plaintiff made an oral motion for default judgment against Discover and Resurgent.

The Trial was consolidated with that of Callie Clark, adversary proceeding 18-04002. The Court heard testimony and admitted Wells Fargo's exhibits 1 through 25 ("D. Ex. ___"). After careful consideration of the pleadings, the evidence presented and the applicable authorities, the Court enters its findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. The Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(I).

## I.    Findings of Fact

The Parties stipulated to the following facts prior to Trial: In 2009 through 2011, Callie Clark, as a student borrower, entered into a series of nine (9) separate Wells Fargo Education Connection Loans totaling $45,240.00. [Doc. 37, Ex. C ¶ 2, D. Ex. 1-9]. Each of the Student Loans was co-signed by Connie Clark, Callie's mother. Robert Clark, Callie's father, co-signed one of the Student Loans as well. *Id.* Each of the Student Loan Agreements evidence a student loan made

---

[1] In their Pretrial Order, the Parties state that one issue the Court must decide is whether it "can/must consider factors as of the time of trial, not simply the time of the discharge date, including the discharge of virtually all of the Plaintiffs' other student loans in this action." [Doc. 37, ¶ 12]. The case law cited for this proposition indicates that the parties may disagree on whether a partial discharge would be available to the extent the Court sought to discharge some of the student loan debts against some of the defendants in this case and not others. *Walker v. Sallie Mae Servicing Corp.*, 427 B.R. 471 (B.A.P., 8th Cir. 2010). This issue was not raised at Trial, but as discussed in *Andresen v. Nebraska Std Loan Program, Inc.*, 232 B.R. 127, 136-37 (B.A.P., 8th Cir. 1999) discharging some, but not all, student loans, is not a "partial discharge".

to Callie Clark by Wells Fargo within the meaning of and as contemplated by 11 U.S.C. §523(a)(8). [Doc. 37, Ex. C ¶ 4]. Wells Fargo currently holds all right, title and interest to each of the Student Loans. *Id.* The original total balance of the Student Loans was $45,240. [Doc. 37, Ex. C ¶ 2]. The total payments made on the loans was $2,488.29. *Id.* The last payment made on the Student Loans was on December 15, 2017, by Callie. *Id*. The unpaid balance outstanding on the Student Loans as of February 3, 2020 plus interest accrued through September 2, 2015, when Wells Fargo stopped accruing interest, is $63,679.93. [Doc. 37, Ex. C ¶ 3].

Plaintiffs have successfully discharged all their unsecured non-student loan obligations listed on Schedule E/F of their Chapter 7 Schedules. [Doc. 37, Ex. C ¶ 8]. Plaintiffs scheduled $186,155 in unsecured debt, of which $161,500[2] (87%) is comprised of Callie's student loans, and approximately $49,793 appears to have been or will be discharged by default as explained in Part III below.[3] [Doc. 37, Ex. C ¶ 8]. The Repayment Period for each of the subject Wells Fargo Student Loans is fifteen (15) years from the date payments were required to begin (the "Repayment Period"). [Doc. 37, Ex. C ¶ 9]. Payments were required to begin no later than five (5) years after the first disbursement. *Id*. At Trial, the Parties stipulated that the remaining time in the Repayment Period is ten years. This stipulation does not necessarily reflect the full terms of the underlying Student Loan documents, which provides that the Repayment Period begins the day after the "Interim Period" ends and defines the Interim Period as the earlier of six

---

[2] The Court notes that while the Parties stipulated in their Pretrial Order that the Plaintiffs had scheduled $161,500 in unsecured student loan debt, the Plaintiffs mistakenly scheduled student loans owed to the Department of Education in the approximate amount of $35,000 in their Schedule E/F. [D. Ex. 12]. As explained in the Joint Motion to Dismiss the United States of America, the U.S. Department of Education "concluded that the Debtors are not co-borrowers or endorsers of the Loans issued in favor of Ms. Callie E. Clark." [Doc. 11, ¶3]. Thus, Plaintiffs' student loan debt is approximately $113,472.93, or 61% of the unsecured debts listed in their schedules.

[3] The Parties stipulated that at the time of Trial the majority of Plaintiffs' student loan debt had been discharged by agreement or default. However, the Court notes that the evidence does not support the calculation of a majority in amount as Wells Fargo is owed $63,679.93, Discover and Resurgent are owed $49,793, none of which was discharged as of the Trial in this proceeding. These facts are not material and the Court accepts them as established. *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 676–78, 130 S. Ct. 2971, 2983 (2010).

months after the student ceases to be enrolled in a qualified school or five years after the date of the first disbursement. [D. Ex. 1-9, p. 2]. Based on the ten-year period, the monthly installments of principal are approximately $530 per month to pay the Student Loans. [Doc. 37, Ex. C ¶ 9].

Callie suffers from anxiety, Asperger's Syndrome, adult-onset obsessive compulsive disorder ("OCD"), and bipolar I disorder with mixed episodes. Although she experienced mental health issues before college and had a history of self-harm and depression, the seriousness and pervasiveness of her mental health conditions became more pronounced while she was in college and has continued since.

Cheryl Melton ("Melton"), a licensed marriage and family therapist who has worked in the mental health field for approximately thirty years testified that she began providing therapy services to Callie in 2010 for anxiety and depression. Melton explained that both OCD and bipolar I disorder can be treated with medication, which Callie takes; however, there is no medication for treatment of Asperger's Syndrome. Callie's moods are unstable with bipolar I disorder; she can shift from a depressed state to a manic state suddenly. Although Callie has individual choices in her life, she has no control over her mental state and the cycle of mania and depression or when she will be beset by obsessive thoughts. Callie experiences feelings of terror and overwhelming anxiety because of her OCD and she is consumed with feelings of shame and worthlessness because of the direct and indirect effects of her condition on her parents.

In periods of mania, Callie will apply for jobs she cannot fulfill or engage in activities that are dangerous and have the potential to cause her harm and cause stress, thereby increasing her chances of symptoms with a depressive episode. During an episode of mania, employers see that she cannot be responsible for the tasks assigned to her and ultimately terminate her employment. There is no cure for Callie's conditions, and it is unknown whether she will experience improvement from her present condition but it is unlikely. Medication has assisted

4

Callie in reducing her symptoms but it has not eliminated them, and she will require treatment for the rest of her life.

Callie does not currently, nor has she ever, lived independently from her parents. Plaintiffs support her entirely as she has had no income since 2015[4]. This support includes, but is not limited to, housing, a car, car insurance, health insurance through the public insurance exchange, prescriptions, food, clothing, and therapy. It is unlikely that Callie will ever be able to maintain stable, long-term employment. It is possible she could work short-term jobs that do not require constant interaction with people, but she needs flexibility to remain at home when she has bipolar or OCD episodes. Connie testified that to her knowledge, Callie has not applied for social security disability and Plaintiffs have not done so on her behalf. Plaintiffs claimed Callie as a dependent in their 2015 tax return. [D. Ex. 15].

Even in the best circumstances, Plaintiffs will likely still need to support Callie financially and emotionally, because when a crisis situation arises, she needs to be at home. Based on these facts, the Court ruled at the conclusion of the Trial that Callie's liability on the Student Loans was dischargeable, and later memorialized that ruling in an order. [Adv. Pro. No. 18-4002, Doc. 68].

Robert, who was 58 at the time of Trial and is now 59, testified that he was at the "back end" of his career and feels he may never be able to stop working given the amount of support Callie needs and the family's finances. Robert had worked for Georgia Pacific for 28 years in 2016 and continues that employment as a claims representative. His gross monthly salary as disclosed in his original Schedule I was $5,526, and his monthly take home pay in Schedule I was $4,278, which is $51,336 per year. [D. Ex. 12.] Robert's gross annual salary in 2015 was reported

---

[4] Callie's testimony was unclear whether she last earned income in 2015 or 2016. *See* Adv. Pro. No. 18-4002, Doc. 68, p. 6].

to be $77,091. [D. Ex. 17]. Robert testified that he has no hope of additional income in the future, as he only has a high school education, but some years he does receive a bonus, which he thought was $9,000 in 2020. Wells Fargo admitted three of Robert's paystubs at Trial which show that in December 2015 he was making $34.55 per hour, and in August and September 2016 he was making $35.50 per hour. [D. Ex. 23]. The December 23, 2015 paystub shows year-to-date regular gross earnings of $64,879.02 and "Total Incentive Award $ - PPP" of $11,731.00. *Id.* The December 23, 2015 paystub shows total year-to-date gross earnings of $83,384.46 and total year-to-date net earnings of $51,509.39. *Id.* The September 16, 2016 paystub shows year-to-date regular gross earnings of $47,939.33 and "Total Incentive Award $ - PPP" of $10,275.00. *Id.* The September 16, 2016 paystub shows total year-to-date gross earnings of $66,106.42 and total year-to-date net earnings of $40,365.72. *Id.* Based upon a 52-week year, at the $35.50 per hour rate Robert's gross regular earnings for 2016 would be $73,840, and with the incentive award Robert's total gross earnings for 2016 would be $84,115. Based on Robert's paystubs, the income reported on Schedule I does not include his incentive award.

In 2015, Connie, who was 64 at the time of Trial and has a high school education, had been employed with Allstate Insurance for 28 years as an office manager, full-time, making $24,000 a year, as demonstrated by her 2015 W-2 income tax form. [D. Ex. 15 at 21][5]. Connie's paystubs for July and August of 2016 show gross wages of $1,500 and net wages of $1,369.75, and show year-to-date gross wages of $12,000 and $13,500 respectively. [D. Ex. 24]. The year-to-date figure in the July 2016 paystub is consistent with a salary of $24,000 per year, but the monthly wages in both paystubs are more consistent with a salary of $18,000. Connie testified that she was

---

[5] Connie's testimony of her income was clear as is the reported income on Plaintiffs' 2015 tax return. However, the information from Connie's paystubs in D. Ex, 24 is conflicting as it would result in annual gross earnings of $18,000. Paragraph 5 of D. Ex. 17 is consistent with the $1,500 per month shown on the paystubs while the response to question 1 is $24,000.

laid off from her job at Allstate in 2020 due to the COVID-19 pandemic. She now works for another insurance company part time making $17,000 per year.[6] She has no prospect of full time work right now and makes $300 less in salary per month than she previously did. She receives a paycheck of $719 every two weeks, which amounts to $18,694 per year or $1,557 per month. Connie has no expectation of any additional income for her household. She has no physical disability to prevent her from doing this type of work.

Connie testified that she thinks Plaintiffs received two COVID-19 stimulus payments in the amount of $1,200 each but was not sure. Plaintiffs' 2015 tax returns reflect gross wages of $101,091, and an adjusted gross income of $67,881. [D. Ex. 15]. Additionally, Plaintiffs received a 2015 federal income tax refund in the amount of $5,089 and a 2015 Georgia income tax refund in the amount of $2,995. [D. Ex. 15]. There is no evidence regarding tax refunds for subsequent years.

Plaintiffs own their home and reaffirmed the mortgage on the property after filing bankruptcy. [D. Ex. 25]. The reaffirmation agreement [D. Ex. 25] provides that Plaintiffs owe $84,921.79 and that this amount will be repaid in 109 months from December 1, 2016. This debt is the entirety of Plaintiffs' secured debt. Plaintiffs' schedules reflect about $45,000 in equity in their home. [D. Ex. 12.]. Connie testified the house is worth the same today as it was on the petition date and that there was $88,000 to $92,000 remaining to be paid on the mortgage. The home is a duplex, and while Plaintiffs live on one side of the duplex and rent the other, their testimony at Trial, their tax returns, and the Schedules reflect that the rental income they receive is less than their rental expenses which includes mortgage interest. [D. Ex. 12, 15]. Plaintiffs receive $7,030 a

---

[6] Connie's gross monthly income on Schedule I in 2016 was $1,366. [D. Ex. 12]. She testified that she currently makes $719 every two weeks and that this is about $300 per month less than she made previously. Assuming biweekly gross pay of $1,000 in 2016 and biweekly pay of $719 currently, the difference is $292 or approximately $300 per pay period and on a net basis may account for the $300 decrease Connie identified.

year in rental income but reported $9,736 in expenses in relation to the rental in 2015. [D. Ex. 15].

Robert testified that they rent the duplex in order to pay the mortgage on it.

In Schedule J, Plaintiffs listed monthly expenses totaling $4,123 and monthly income of $5,194. [D. Ex. 12]. Plaintiffs disclosed the following expenses:

|  | **2016** |
|---|---|
| **Mortgage** | $1,154 |
| **Real Estate Taxes** | $144 |
| **Home Insurance** | $75 |
| **Home Repair/Maintenance** | $125 |
| **Electricity, Heat, Gas** | $202 |
| **Water, Sewer, Garbage** | $100 |
| **Phone, Internet, Cable** | $320 |
| **Prop. Mgmt fees** | $120 |
| **Food, Housekeeping Supplies** | $685 |
| **Clothing/Laundry** | $75 |
| **Personal Care** | $60 |
| **Medical/Dental** | $485 |
| **Transportation** | $325 |
| **Charitable Contributions** | $20 |
| **Life Insurance** | $207 |
| **Car Insurance** | $227 |
| **Cancer Insurance** | $48 |

Based on Plaintiffs' calculations in their Schedule J, with a monthly income of $5,194 and expenses of $4,123, they reported monthly net income of $1,071. Upon review, however, the Court notes that there is a calculation error such that the expenses listed total $4,372. Thus, Plaintiffs' monthly remaining income in 2016 was $822.

Despite this scheduled surplus, both Plaintiffs testified that at the time of filing and currently, they have no additional monthly income after they pay their expenses. Robert testified that when their water heater recently broke, Plaintiffs had to scramble to find approximately $800 to fix it. Connie also testified that if they had any money after paying expenses, which she

8

identified as mortgage, utilities, medications, food and doctors, she would have created an emergency fund, but they do not have any funds left at the end of each month to begin building such a fund. Connie said that the family lives "paycheck to paycheck," and they have never had disposable income. Robert stated that they do not have a "cushion" and worry about household expenses as there is nothing they can cut from their budget. Plaintiffs are able to pay their bills and Callie's expenses, but that is it.

Plaintiffs' Schedule A/B reflects they own three older cars, all of which are paid off: a 2003 Nissan Altima with 60,000 miles and a value of $3,500; a 2006 Ford F-150 with 57,000 miles worth $6,000; and a 2005 Nissan Xterra with 135,000 miles worth $4,000. [D. Ex. 12]. Plaintiffs testified that the vehicles require some repair, but that they are all still operable. Additionally, Schedules A/B reflect that they own furniture and appliances with a value of $2,000, a television and stereo equipment worth $500, firearms for hunting worth $600, and miscellaneous clothes and shoes worth $500. *Id.* Connie testified that they do not "go out and do things" or own luxury or extraneous items, which is supported by their Schedules.

Plaintiffs did not provide an updated budget but did testify that their monthly income was approximately $300 less than in 2016. Connie testified that the mortgage was $1,351 per month which, when comparing that amount to the monthly mortgage payment and real estate taxes disclosed in Schedule J results in an increase in expense of $53 per month. The food and housekeeping supplies category, based on the Court's general knowledge of the cost of food is likely understated for a family of three, however, there was no evidence presented as to this expense other than Plaintiffs' Schedule J. Connie testified that Callie has insurance through the insurance exchange/marketplace that costs $5 per month and that Callie's prescriptions have co-pays of $40-$50 per month. It is not clear whether these amounts are different than those in Schedule J. The transportation expense in Schedule J may be overstated because Robert used to

9

drive from Rome to Atlanta each day for work, but during the pandemic he has been working from home. Connie also testified that the vehicles require some amount of repair. The Court notes that the vehicles are now six years older than they were at the time of filing such that it is also possible that the savings realized from the lack of commute has been eroded by additional maintenance costs. Robert testified that their financial condition was the same or worse than when they filed their bankruptcy case.

At the time of filing, Robert had a 401k retirement account through his employer, and the Schedules reflect an account balance of $215,000. [D. Ex. 12]. These funds were exempt from Plaintiffs' chapter 7 bankruptcy case as allowed by the Bankruptcy Code. [D. Ex. 12]. Robert testified that he contributes about $161 per paycheck to his 401k account, and he receives a paycheck every two weeks. He clarified that his 401k contributions were a percentage of his paycheck, as opposed to a specific amount, and thus in 2016 fluctuated from $165 to $170. [D. Ex. 23]. The account statements for October 2015 through June 2016 show an election of 6% of pre-tax income. [D. Ex. 16]. Over the course of 2015, Robert contributed a total of $4,287.93 to his 401k account, which averages to $178 per paycheck. *Id*. Robert testified that his employer matches his contributions at a 1:1 ratio, but that matching contributions can sometimes change. The account statements reflect an employer match of 85% of Robert's 401k contributions. *Id*.

Connie testified that in 2014, Robert borrowed money from the 401k account. *Id*. On June 30, 2016, the balance on the loan was $4,274.57. *Id.* However, Connie testified that this loan has since been paid back. Robert testified that he took the loan to purchase a vehicle the company was selling for his own personal use, a Ford F-150. The Pretrial Order states that he repaid the loan at $92 per month, which is generally consistent with the bi-weekly deduction of $46.61 shown on his August and September 2016 paystubs. [Doc. 37, p. 20; D. Ex. 23]. At Trial however, when questioned about a $119 deduction from his paystub that was sent to Atlanta

10

Federal Credit Union and a $46 deduction that was a payment to an Employee Savings Plan Loan-1, Robert became confused. [D. Ex. 23]. He knew one of the payments was being made on the truck loan, but could not identify which one. In their responses to Wells Fargo's interrogatories, Plaintiffs stated that the loan from the 401k account was on account of "[s]imply unable to keep up and survive financially." [D. Ex. 17]. Thus, the Court believes the credit union loan was to purchase the used vehicle and the 401k loan was to help with household expenses.

In 2016 the balance in Robert's 401k account was $225,924.80. [D. Ex. 16]. Robert testified that he believes the balance is now closer to $234,000. Robert acknowledged that he can access the funds in that account when he reaches age 59 and 6 months, but he expressed concern regarding his age and finances in general, noting that he did not know if he would ever be able to stop working.

While neither Connie nor Robert are currently taking social security benefits, the Social Security Administration estimates that at full retirement age (66 years and 6 months old), Connie's monthly Social Security benefits payment would be $1,083 per month. [D. Ex. 22]. The maximum amount Connie can receive is $1,525 per month. At Robert's full retirement age (67 years), his estimated monthly payment would be $2,378 per month. [D. Ex. 21]. The maximum amount Robert can receive is $4,090 per month. It is likely that Robert would wait until as late as possible, after retirement, to take social security income in order to maximize his distributions. Further, the tax repercussions of taking social security benefits while still working full time would not inure to Robert's benefit. There was no indication of how long Connie intended to work, but for the same reasons as articulated for Robert, it is not likely she would take social security benefits while she maintained employment. Thus, Plaintiffs can anticipate a monthly income of at least $3,461, but no more than $5,615 per month from social security income. This equals a yearly income of $41,532 to $67,380.

Plaintiffs testified that Callie met a political science professor from Berry College while she was of high school age who became a mentor to her and convinced her that Berry College was the school she should attend. Connie testified that Callie was set on Berry and she could not say no to her because of her concern for the potential effect on Callie. Robert testified that they wanted Callie to attend college and that he was afraid that if they said no to Berry College that she would not go to college at all.

Plaintiffs testified that the bankruptcy case was filed to address the student loan debts, as the couple had no ongoing lawsuits, garnishments, or repossessions.

## II.    Conclusions of Law

The issue in this proceeding is whether the Student Loans are dischargeable pursuant to 11 U.S.C. § 523(a)(8), which states:

> (a) A discharge under section 727, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
> (A)
> (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

This section of the Bankruptcy Code contains a "clear and self-executing requirement for an undue hardship determination ...." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275, 130 S. Ct. 1367, 1380 (2010). The Eleventh Circuit has adopted the *Brunner* test to determine undue hardship, which requires Plaintiffs to prove the following by a preponderance of the evidence[7]:

---

[7] The Parties agree that this matter is governed by the standard established in *Brunner*.

(1) that the debtor cannot maintain, based on current income and living expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans.

*Hemar Ins. Corp. of Am. v. Cox (In re Cox)*, 338 F.3d 1238, 1241 (11th Cir. 2003); *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987); *Educational Credit Mgmt. Corp. v. Mosley (In re Mosley)*, 494 F.3d 1320, 1324-25 (11th Cir. 2007). "If Debtor fails to prove just one element, the inquiry ends, and the student loans will not be discharged." *Hill* at 916.

### A. Minimal Standard of Living

Under the first prong of the *Brunner* test, Plaintiffs must prove that they will be unable to "afford the basic living necessities if forced to repay the loan." *Brunner*, 831 F.2d at 396; *Gordon v. U.S. Dep't of Educ. (In re Gordon)*, Adv. Proc. No. 07-09049-MGD, 2008 WL 5159783, at *5 (Bankr. N.D. Ga. Oct. 10, 2008) (Diehl, J.). The analysis requires a reasonable evaluation of daily expenses necessary to live; "shelter, basic utilities, food and personal hygiene products, vehicles, and the costs associated with a vehicle, health insurance, and some source of recreation" are deemed necessary for a minimal standard of living for debtors and their dependents. *Gordon*, 2008 WL 5159783, at *6; *Hill v. Educ. Credit Mgmt. Corp. (In re Hill)*, 598 B.R. 907, 916 (Bankr. N.D. Ga. 2019) (Sigler, J.); *Bush v. U.S. Dept. of Educ.* (*In re Bush*), 450 B.R. 235, 240 (Bankr. M.D. Ga. 2011). Courts are encouraged to apply their "common sense knowledge gained from ordinary observations in daily life and general experience to determine whether [a] debtor's expenses are reasonable and necessary." *Clavell v. U.S. Dept. of Educ., et al.* (*In re Clavell*), 611 B.R. 504, 522 (Bankr. S.D.N.Y. 2020) (citations omitted).

13

Plaintiffs earn not insignificant income. In 2015 their gross earnings were $101,091. Even with the reduction in Connie's income, their gross income is likely to be in the $90,000 range depending on Robert's bonuses, until one or both of them retires. Notwithstanding this level of income and the surplus shown on Schedule J, both Connie and Robert testified credibly that they had no excess income and live paycheck to paycheck.

In 2016, Plaintiffs' monthly net income after expenses was approximately $822. Since then, Plaintiffs' monthly income has been reduced by $300 and mortgage expenses have risen by $53 per month. Thus, based upon the budgetary evidence presented it seems that after paying monthly expenses Plaintiffs could have as much as $469 remaining. While the Court believes that this amount could be overstated because the food expense appears understated in Schedule J, Plaintiffs did not submit any other evidence of their current monthly expenses.

In 2020, Robert received a bonus and the family received COVID-19 stimulus payments. It is unknown if there will be any further government assistance because of the pandemic. Robert testified that he generally receives a yearly bonus from his employer, and incentive bonuses were reflected on his December 23, 2015 and September 16, 2016 paystubs in the amounts of $11,731 and $10,275 respectively. Other courts have found that in reviewing disposable income, calculations should include predictable, reliable, anticipated bonuses that generally reflect a component of the debtor's total compensation year over year. *See In re Arsenault*, 370 B.R. 845, 848-52 (Bankr. M.D. Fla. 2007) (determining whether chapter 13 debtors were paying all their projected disposable income in the plan); *In re Navin*, 548 B.R. 343, 351-52 (Bankr. N.D. Ga. 2016) (Baisier, J.) (deciding whether a chapter 7 case should be dismissed for abuse based on the totality of the circumstances of the debtor's finances).

Additionally, Plaintiffs received a 2015 federal tax refund in the amount of $5,089 and state tax refund in the amount of $2,995. [D. Ex. 15]. Because a bonus in some amount may

be reasonably anticipated every year, and Plaintiffs deduct their mortgage interest from the portion of the duplex generating income such that they rent the duplex for a loss every year resulting in a tax refund, this amount must be included as income for purposes of calculating monthly net income. [D. Ex. 15].

Plaintiffs' budget, as set forth in Schedule J and adjusted based upon the testimony at Trial, does not reflect any excessive or unnecessary expenses. *Compare Perkins v. PA Higher Educ. Asst. Agency* (*In re Perkins*), 318 B.R. 300, 304 (Bankr. M.D.N.C. 2004) (the debtor failed to minimize her monthly expenses when her budget included $250 savings for a new car, $200 in charitable contributions, $20 for special occasions, $20 for gifts and related travel, $100 for miscellaneous expenses, $30 for vacations, $30 for inkjet cartridges, $42 in savings for a new computer, and $35 in savings for a new sewing machine). Plaintiffs can only afford their mortgage because of their ability to rent out half of their residence, they drive older cars, and they actively avoid unnecessary expenses. Plaintiffs have maximized their income throughout their lives based on their education and skills. Plaintiffs live a modest lifestyle and support their daughter as well. There is no budget for recreation or entertainment and no savings for emergencies.

In its trial brief, Wells Fargo questioned the amount Plaintiffs spend on phone, internet and cable which was budgeted at $320 per month. [Doc. 49]. The Court does not find that the expense for cellular telephones for three people, internet which is necessary for Robert and Connie to work at home (since 2020) and cable for a household that does not budget any recreation is excessive. Further, this amount is consistent with the Court's general knowledge of prevailing rates for such services. Wells Fargo also questioned the monthly medical and dental expense reported by Plaintiffs. *Id.* Connie testified that Callie's prescriptions cost them $40 to $50 per month and her health insurance costs $5 per month. The Court has no further information about

the expense listed in Schedule J, but notes that Robert's pay stubs do not reflect any coverage for dental insurance which may account for some or all of the other expense disclosed.

The question that the evidence presents is whether Plaintiffs proved it is more likely than not that they cannot pay the Debt, at $530 per month, and maintain a minimal standard of living. Plaintiffs testified that they live paycheck to paycheck and have nothing left after paying bills and that this state of affairs existed in 2016 and is now the same or worse. However, the budget contained in Schedule J as adjusted by the amounts Connie testified to results in excess income to pay Wells Fargo in the amount of $469. Furthermore, Robert makes voluntary contributions to his 401k account, which the Court must evaluate for reasonableness.

Initially, the Court notes that making 401k contributions and the existence of a 401k account do not preclude a finding of undue hardship. Many courts have found that "modest retirement contributions can be reasonable expenses and there is no *per se* rule that such contributions should be disregarded in determining whether a debtor can repay student loans without undue hardship." *Clavell*, 611 B.R. at 521. Indeed, "[o]ne of the financial obligations of a responsible adult is to make reasonable provisions for the future, both for the adult's own good and for the good of his or her family." *Id.* Discontinuing contributions itself could be an undue hardship. *Id*. Determining whether a 401k contribution is reasonable when the debtor cannot otherwise repay student loans and maintain a minimal standard of living is a fact intensive inquiry:

> [i]n making this fact-intensive determination, courts should consider a number of factors, including but not limited to: the debtor's age, income, overall budget, expected date of retirement, existing retirement savings, and amount of contributions; the likelihood that stopping contributions will jeopardize the debtor's fresh start by forcing the debtor to make up lost contributions after emerging from bankruptcy; and the needs of the debtor's dependents. Courts must allow debtors to seek bankruptcy protection while voluntarily saving for retirement if such savings appear reasonably necessary for the maintenance or support of the debtor or the debtor's dependents.

*Craig v. Educ. Credit Mgmt. Corp.* (*In re Craig*), 579 F.3d 1040, 46-47 (9th Cir. 2009).

Here, Plaintiffs are within a few years of traditional retirement age, do not have prospects of increasing their income from employment and are supporting their daughter and will likely have to continue this support for her lifetime. However, Robert has over $234,000 in his 401k account, and his employer matches his contributions. While the Court would not compel a debtor to cease all 401k contributions, in this circumstance, where the evidence presented shows Plaintiffs have income left at the end of every month that is $61 short of the amount needed to make the required monthly payments to Wells Fargo, it would not be unreasonable for Robert to reduce his 401k contributions to enable Plaintiffs to repay the Student Loans. Reducing the contribution would not affect Plaintiffs' ability to provide a minimal standard of living for themselves and their household. Additionally, the evidence demonstrates that Plaintiffs regularly have additional income each year from Robert's bonus and tax refunds and that in a little over 4 years, their residence will be paid off such that they can anticipate an increase in monthly income of $1,148. [D. Ex. 25]. At that time resuming the prior contribution amount would be possible. Given Plaintiffs' significant income and the evidence of excess in their monthly budget, in the circumstances of this case, a $61 per month reduction in 401k contributions would not impose an undue hardship on Plaintiffs.

At Trial Wells Fargo's counsel suggested that Plaintiffs leverage the equity in their home and/or Robert's 401k account to provide access to funds to pay Wells Fargo. While an analysis on this point is not material to the Court's findings, the Court does not find either argument persuasive because, if Plaintiffs were to obtain a home equity loan or line of credit to repay the Student Loans, it would neither increase Plaintiffs' income nor decrease their expenses. Instead, Plaintiffs would have replaced an unsecured debt with a secured debt that may put their home at risk.

Likewise, the Court is not persuaded that Robert must obtain a loan against his 401k or liquidate it in part for the purpose of paying the Student Loans. The undisputed facts are that after retirement, Plaintiffs will have a combined monthly income of less than they do now. Retirement will not decrease their expenses as it is reasonable to infer increased medical costs as Plaintiffs age and the need to replace the used cars that currently require maintenance to remain operable. Thus, the household will need the funds from Robert's 401k account to support them as they age. While a balance of $234,000 in a retirement account may appear like a substantial sum, when considering Plaintiffs' ages and the continued need to support their daughter it seems likely the funds will not last for all of their lifetimes. *See Marcotte v. Brazos Higher Educ. Service Corp., et al.* (*In re Marcotte*), 455 B.R. 460, 470 (Bankr. D.S.C. 2011) (finding that a debtor is not required "to liquidate a minimal amount in a retirement account and apply those funds to an educational loan"); *Peel v. SallieMae Serv.-Heal Loan, et. al.* (*In re Peel*) 240 B.R. 387, 393 (Bankr. N.D. Cal. 1999) (finding that "[t]his Court would not favor a rule that debtors attempting to discharge debts alleged to be unduly burdensome may never put any money aside for retirement. . . Nearly everyone should save some money for old age and retirement.").

While the Plaintiffs' testimony at Trial was that they live paycheck to paycheck, that is not born out by their budget and income. By Plaintiffs' own admissions in Schedule J, they have in excess of $400 available at the end of every month, which is not reflective of bonuses or tax refunds. As a result, the Court finds that Plaintiffs have not established that it is more likely than not that they cannot pay the Debt and maintain a minimal standard of living. Because Plaintiffs have not established the first prong of the *Brunner* test, the Court's analysis ends here.

### III.    Default Judgment as to Discover and Resurgent

As previously discussed, both Discover and Resurgent were served with the Complaint and failed to respond. [Doc. 2, 5, 6, 20, 21, 23, 26, 28, 30, 31]. An entry of default was

18

entered against both parties on May 16, 2019. At Trial, Plaintiffs proffered that the elements required to enter a default judgment against Resurgent and Discover had been met as the testimony was also applicable to these defendants. Plaintiffs then made an oral motion for entry of default judgment against each of Resurgent and Discover.

Default judgments are governed by Federal Rule of Civil Procedure 55(b), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7055. Whether to enter default judgment is within the discretion of the Court. *Hays v. Wellborn Forest Prods., Inc. (In re Spejcher)*, No. 06-6347, 2006 WL 6592065, at *1 (Bankr. N.D. Ga. Oct. 30, 2006) (Massey, J.) (citing *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1576 (11th Cir. 1985)). To warrant entry of a default judgment, "[t]here must be a sufficient basis in the pleadings for the judgment entered." *Nishimatsu Constr. Co., Ltd. v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). When a defendant fails to answer, the Plaintiffs' well-pleaded factual allegations are deemed admitted. *Id*. Facts that are not well pleaded and conclusions of law are not deemed admitted. *Id.* Therefore, the Court must determine whether Plaintiffs' well-pleaded factual allegations are sufficient to justify entry of judgment. *See EFS Inc. v. Mercer (In re Mercer)*, No. 13-3031, 2013 WL 3367253, at *1 (Bankr. M.D. Ala. July 5, 2013).

Plaintiffs allege in the Complaint that the loans held by Resurgent and Discover are educational loans made, insured or guaranteed by a governmental unit. [Doc. 1, ¶1]. Plaintiffs further allege that Resurgent, upon information and belief, acquired from Sallie Mae and is now the holder of a "Smart Option Student Loan" which was taken out for Plaintiffs' daughter. [Doc. 1, ¶ 6]. This loan has a current balance of $3,600.00, with monthly payments due of approximately $367.00. *Id.* Discover, upon information and belief acquired from Citibank, N.A. and now holds three student loans which were co-signed by Plaintiffs with a current total balance of approximately $47,600.00 and monthly payments due of approximately $456.00. [Doc. 1, ¶ 7].

The evidence at Trial demonstrates that Plaintiffs are entitled to a default judgment in their favor against Resurgent and Discover, as Plaintiffs satisfy all three factors of the *Brunner* test.

### A.    Minimal Standard of Living

The Court has concluded that Plaintiffs are able to pay the Wells Fargo Student Loans because of the excess in their monthly budget, significant income and anticipated increase in their income from the pay-off of their mortgage in early 2026. However, this is not true for the additional amounts that would be required to pay Discover and Resurgent in the context of Plaintiffs' ability to pay their expenses. Adding the additional monthly amounts necessary to pay Discover and Resurgent would make payments exceed the amount of additional income available. Even though the state of Plaintiffs finances will change during the repayment period it is not sufficient to provide Plaintiffs with a minimal standard of living while repaying these additional student loans.

### B.    Persistent State of Affairs

Under the next prong of the *Brunner* test, Plaintiffs must prove that they "cannot maintain a minimal standard of living for a significant portion of the repayment period if the loans are not discharged" due to circumstances not within their control. *Hill*, 598 B.R. at 918 (quoting *Gordon*, 2008 WL 5159783, at *7). The standard assumes a "certainty of hopelessness" that Plaintiffs will not experience an improvement in their financial condition. *Id.* (quoting *Douglas v. Educ. Mgmt. Corp. (In re Douglas)*, 366 B.R. 241, 256 (Bankr. M.D. Ga. 2007)). This may include an evaluation of factors such as a "mental disability, lack of usable or marketable job skills, and lack of assets that could be used to repay the loan." *Mosley*, 494 F.3d at 1326. Additionally, "a court should consider factors such as the debtor's age, age of the debtor's dependents, debtor's education, work and income history, physical and mental health, and other relevant circumstances." *Douglas*, 366 B.R. at 256 (internal citations omitted) (noting that the second prong

20

of *Brunner* required the Court to evaluate the effect of a debtor supporting a child in their analysis).

Courts outside of the Eleventh Circuit have explained that

> The type of "additional circumstance" that would affect the debtor's continuing ability to repay would be a circumstance that impacted on the debtor's future earning potential but which was either not present when the debtor applied for the loans or has since been exacerbated. Otherwise, the debtor could have calculated that factor into its cost-benefit analysis at the time the debtor obtained the loan. An example of an additional circumstance impacting on the debtor's future earnings would be if the debtor experienced an illness, developed a disability, or became responsible for a large number of dependents after receiving the loan.

*Thoms v. Educational Credit Mgmt. Corp.* (*In re Thoms*), 257 B.R. 144, 149 (Bankr. S.D.N.Y. 2001) (evaluating the impact of the debtor supporting her own minor child without financial support and her two minor siblings in the context of a *Brunner* analysis).

This requires forward-looking analysis based on the length of the repayment period.

*See In re Acosta-Conniff*, 686 F. App'x 647, 648-49 (11th Cir. 2017). In determining what constitutes a significant portion of the repayment period, Courts have noted that

> Clear judicial guidance is lacking on the question of how much time constitutes a "significant portion" of the repayment period. In applying this part of the *Brunner* test, courts have tended to focus on the qualitative rather than the quantitative . . . [t]here is no mechanical approach or inflexible fixed length of time that constitutes a significant portion of the repayment period in every case (e.g., if the repayment period is twenty (20) years, the significant portion is ten (10) years; or if the loan repayment period is twenty-five (25) years, the significant portion is twelve (12) years). Rather, these determinations can be made only on a case-by-case basis, as part of the intensely fact-specific nature of the "undue hardship" analysis…

*Price v. Devos (In re Price)*, 573 B.R. 579, 606-09 (Bankr. E.D. Pa. 2017). In *Price*, the court found that with a remaining repayment period of only seven years, the relevant forward-looking time period was five years, or 70% of the remaining repayment period. *Id.*; *see also Mayer v. Pennsylvania Higher Educ. Ass't. Agency (In re Mayer)*, 198 B.R. 116, 127 (Bankr. E.D. Pa. 1996) (finding that because "the further one attempts to project into the future, the more uncertain the prediction becomes," applying the second prong of *Brunner* required an evaluation of no more

than five years into the ten-year repayment period). Similarly, the court in *Nitcher* found that five

years of a seven-year repayment term was a "significant portion" of the repayment period. *See*

*Nitcher*, 606 B.R. at 78.

Plaintiff presented no evidence and or allegations about the repayment periods of

the debts owed to Discover and Resurgent. However, Resurgent was alleged to be owed $3,600

with monthly payments of $367. The interest rate was not alleged, but at $367, the balance without

interest would be repaid in less than a year. Discover was alleged to be owed $47,600 with monthly

payments of $456, which would result in repayment of the balance without interest in 109 months

or less than nine years.

At Trial, the Parties agreed that the repayment period for the Wells Fargo Student

Loans was 15 years, with 10 years remaining on that period. Because the Wells Fargo Debt is not

dischargeable, it will be an expense for a significant portion, if not the entirety, of the Discover

and Resurgent repayment periods.

The evidence shows that Plaintiffs' duplex should be paid off in a little over four

years, which encompasses the entirely of the period necessary to repay Resurgent, and a portion

of the period necessary to repay Discover. [D. Ex. 25]. That being the case, in early 2026, Plaintiffs

will have increased monthly cash flow of $1,148, which would afford them the ability to make

payments to Discover.

The payoff of the mortgage will occur in approximately fifty months, slightly less

than halfway through the time necessary to repay the balance of the Discover loan. Thus, the

question the Court must answer is whether this time period is a "significant portion of the

repayment period." When considered in conjunction with the ages and financial circumstances of

Plaintiffs, the Court finds this to constitute a significant portion of the repayment period. *See*

*Nitcher*. 606 B.R. at 77 (explaining that age and education level effects the analysis of what may

constitute a significant portion of the repayment period, such that five years of a seven-year repayment period is significant for a 38-year-old plaintiff with a graduate degree). Based on the foregoing, Plaintiffs will be subject to undue hardship for a significant portion of the Discover and Resurgent repayment periods if the loans are not discharged, satisfying the second prong of *Brunner*.

### C.  Good Faith Efforts to Repay the Student Loans

The third prong of the *Brunner* test requires Plaintiffs prove that they made a good faith effort to repay the Student Loans. This is determined by measuring efforts "to obtain employment, maximize income, and minimize expenses," and as in the prior prong, is not a condition of their own making either willfully or negligently. *Mosley*, 494 F.3d at 1327. There is no evidence regarding payments to Discover or Resurgent. However, the evidence shows that Callie made some payments to Wells Fargo, with the last payment made in 2017. When Callie was employed she would send her entire paycheck to Wells Fargo to make payments on the Student Loans which was only possible because Plaintiffs were supporting her.

Many courts have considered whether failing to make any payments on a student loan prohibits a finding of good faith and have generally found that such a failure does not constitute a lack a good faith. *See Mosley*, 494 F.3d at 1327; *Hill*, 598 B.R. at 921-22; *Educ. Credit Mgmt. Corp. v. Polleys (In re Polleys)*, 356 F.3d 1302, 1311 (10th Cir. 2004). Plaintiffs co-signed the Student Loans to allow their daughter to obtain a college degree. Neither Callie nor Plaintiffs thought Callie would become virtually unemployable. Furthermore, the Court does not find that a parent's desire for their child to go to college and protect her health in co-signing loans evidences bad faith. Rather, this evidences a desire to support and protect Plaintiffs' family and provide the opportunity for a better future to an intelligent and motivated child. Further, neither Plaintiffs nor their daughter are at fault for the mental health issues that preclude Callie from working in a paid

23

position and ability to repay the Debt. Both Melton and Callie's testimony demonstrate her intense desire to work, even part-time. Furthermore, the only reason Callie was able to make payments to any of her student loan creditors was because Plaintiffs supported her financially.

Although Callie has not applied for social security disability income, this is likely because it would prevent her from seeking any type of employment in the future, which the Court notes would be detrimental to her mental health. Given the particular facts and circumstances in this case, requiring that Plaintiffs or Callie seek social security disability income is not something the Court believes is required to establish good faith. Further, there is no evidence of what amount she might receive from a disability determination such that there is no basis for the Court to determine what effect it would have on monthly income. Thus, it will be necessary for Plaintiffs to continue to support their daughter in the future. The testimony that Callie has tried her hardest to address her conditions and reduce her burden on her parents was credible and sincere. It is evident that Plaintiffs are pained by Callie's inability to work and live independently.

The Court concludes that Plaintiffs have established their good faith efforts to repay the student loan debt. Because Plaintiffs have also satisfied the first two prongs of the *Brunner* test with respect to Discover and Resurgent, the Court concludes that requiring Plaintiffs to repay the loans to Discover and Resurgent will subject them and their dependent to an undue hardship, and therefore the loans are dischargeable. .

## V.      Conclusion

Plaintiffs are caring and concerned parents who supported their daughter in her quest to obtain a college degree and fulfill her dreams of being a lawyer. Unfortunately, just as her independent life was beginning, Plaintiffs' daughter became plagued by the life-altering effects of adult-onset OCD and the continued effects of anxiety, bipolar I disorder, and Asperger's Syndrome. While she has struggled to manage suicidal tendencies and establish stability for the

last decade, Plaintiffs' daughter cannot obtain the type of employment that would enable her to maintain a minimal standard of living while repaying her Student Loans during the applicable Repayment Period. Because of this, she will likely always be dependent on her parents.

Plaintiffs, who have maximized their educations and careers throughout their lives, live modestly, without any luxuries, and are nearing traditional retirement age. Plaintiffs did not establish that it is more likely than not that they cannot afford a minimal standard of living while supporting their daughter and also paying the Student Loans that they co-signed to their detriment. This conclusion is based upon the income and budgetary evidence presented as well as the upcoming pay-off of their mortgage. Plaintiffs shoulder no culpability for their role in this current situation. They co-signed the Student Loans under an earnest belief that it was in the best interest of their daughter who would use her degree to repay the debt. Even after the situation worsened, Plaintiffs made their best effort to enable their daughter to pay the Student Loans. Thus, the Court is convinced Plaintiffs seek redress from the Court in good faith. Notwithstanding this finding, because the *Brunner* standard requires that each element be established the Court must find that repayment of the Debt to Wells Fargo will not constitute an undue hardship under 11 U.S.C. § 523(a)(8) and the Student Loans are not dischargeable. In contrast, the student loans owed to Discover and Resurgent are dischargeable by default. Accordingly, it is

**ORDERED** that the Debt owed to Wells Fargo Bank, N.A. is not dischargeable. It is further

**ORDERED** that the student loan debts owed to Discover Bank, N.A., and Resurgent Capital Services are dischargeable and judgment by default will be entered against Discover Bank, N.A. and Resurgent Capital Services.

Separate judgments will be issued.

**END OF ORDER**

**<u>Distribution List</u>**

Robert Clark
20 Cornerstone Dr
Rome, GA 30165

Connie Clark
20 Cornerstone Dr
Rome, GA 30165

David A. Cox
David A. Cox Law, LLC
2870 Peachtree Road #183
Atlanta, GA 30305

John G. McCullough
Aldridge Pite, LLP
Suite 500, Fifteen Piedmont Center
3575 Piedmont Road, N.E.
Atlanta, GA 30305